IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

*UNITED STATES of AMERICA,*

Case 1:18-cr-10468-13 NMG

v.

*EDWARD CHAPMAN,*
          Defendant.

EMERGENCY MOTION FOR
TEMPORARY RELEASE
ON HOME CONFINEMENT

Edward Chapman, defendant, by his counsel, Kevin L. Barron,
Esq., respectfully moves the Honorable Court, on an emergency
basis and over government objection, for an order under 18 USC §
3145(c) modifying the Court's February 7, 2020 electronic order
(Doc. 331) of detention for "exceptional reasons" and allowing
defendant's temporary post-conviction release on home
confinement and electronic monitoring due to the changed
circumstances created by the novel corona virus epidemic.   The
government opposes this motion.

FACTS

The Massachusetts courts have already determined to release
as many inmates as possible to avoid exacerbating this public
health crisis and adding unnecessarily to the inflow of corona
virus patients at hospitals around the state already under heavy
stress.   The Supreme Judicial Court has issued a decision
creating a rebuttable presumption in favor of releasing pre-

trial detainees who have not previously been subject to a finding of dangerousness under MGL c. 276, §58A.  See, *CPCS v. Chief Justice of the Trial Court*, No. 12926, March 24, 2020.[1] There , the SJC makes many findings about the novel corona virus epidemic applicable to this proceeding, findings with which the Court is well familiar.

The CDC has stated that "[c]orrectional and detention facilities . . .. present[] unique challenges for control of COVID-19 transmission among incarcerated/detained persons, staff, and visitors." CDC, Interim guidance on management of Coronavirus 2019 (COVID-19) in Correctional and Detention Facilities (2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (CDC Guidance). These challenges include-but are not limited to-the fact that incarcerated individuals "live, work, eat, study, and recreate within congregate environments, " limited options for medical isolation of those showing symptoms, preexisting conditions among incarcerated individuals that may enhance their risk of severe disease, and limited ability of incarcerated individuals to engage in disease prevention behaviors such as frequent hand washing. *Id.*

---

[1] https://www.mass.gov/doc/sjc-12926-opinion/download

Under the present circumstances, Mr. Chapman presents a reasonable risk for home detention.  This 53 year-old hypertensive defendant, housed at Norfolk County Jail, has been detained since his initial appearance on May 30, 2019. Defendant pled guilty under agreement  with the government on March 9, 2020.  Docs. 365, 366.  Mr. Chapman had intended to bank credit for his sentencing but is now justifiably frightened by the spread of the disease inside detention centers, houses of correction and prisons in Massachusetts and throughout the United States.

Defendant proposes *temporary* release on electronic monitoring and 24-hour home confinement in the custody of his uncle, acting as bail custodian, at the uncle's private residence (rented from defendant).  Declaration of Eric Ortiz, Ex. A.  This is a private residence in a three-unit dwelling with a regular land line and no weapons or dangerous dogs on premises.  *Id.*  The uncle believes there is no personal on criminal justice status in the building.

There is a sizeable prison population in Massachusetts, probably in excess of 20,000.  If only a small percentage of that population required hospitalization, it would nonetheless represent a thousand unnecessary patients taking badly needed hospital beds.  There are 11,226 persons in custody at houses of correction and  8,360 in the Massachusetts DOC.  Massachusetts

3

DOC Weekly Inmate Count[2].  This number would likely not include federal detainees held under contract at Massachusetts houses of correction, prisons, D.W. Wyatt and ACI Cranston in Rhode Island and Stafford in New Hampshire.

Detention centers claim they are screening for corona virus infection to prevent the spread of disease inside jails.  Such measures useless.  About half the persons infected with novel corona virus are completely asymptomatic.   See, e.g., Nishiura, Kobayashi, Suzuki, et al., *International Journal of Infectious Disease* , "Estimation of the Asymptomatic Ratio of Novel Coronavirus Infections (COVID-19)", February 13, 2020. [3] Moreover, the disease becomes airborne (beyond droplets) and symptoms do not appear for about five days after infection.


ARGUMENT
POINT I:
AVOID OVERWHELMING HOSPITALS

Detainees like defendant, who do not present a heightened risk of flight or dangerousness, especially where they are older, should be released for the present to avoid overburdening hospitals.  The principles guiding the decision whether to detain a defendant under the Bail Reform Act are now subject to the exigencies of a dangerous epidemic.  As the Supreme Judicial

---

[2] https://www.mass.gov/doc/weekly-inmate-count-3162020/download
[3] https://www.ijidonline.com/article/S1201-9712(20)30139-9/pdf

Court found, the prison system "has limited capacity to offer the sort of specialized medical interventions necessary in a severe case of COVID-19.  Thus, as seriously ill individuals are transferred from correctional institutions to outside hospitals, any outbreak in a correctional institution will further burden the broader health care system that is already at risk of being overwhelmed."  *CPCS v . Trial Court, supra* pp. 10 - 11.

The unnecessary overburdening of hospitals and public health authorities is an overriding public safety factor not ordinarily considered in making determinations under the Bail Reform Act.  Shipboard outbreaks, such as cruise ships, have shown that the number of infected among a population increases dramatically in the confines of a vessel, perhaps the nearest equivalent to a prison.  In particular, the M/V DIAMOND PRINCESS cruise ship, quarantined at Yokohama in February this year, presents a solid example of the risk.  See, Rocklöv, Sjödin & Wilder-Smith, February 28, 2020, " COVID-19 outbreak on the Diamond Princess "Cruise Ship: Estimating the Epidemic Potential and Effectiveness of Public Health Countermeasures",[4] National Center for Biotechnology Information (NIH).  Although extensive countermeasures were employed by Yokohama authorities to contain the outbreak to 619 of the 3,700 passengers and crew,

---

[4] https://www.ncbi.nlm.nih.gov/pubmed/32109273

the infection rate itself was four times higher than that experienced at the epicenter of the Outbreak in Wuhan, China.

The most relevant conclusion of the Yokohama study, however, is what would have happened under circumstances where, like detention centers, public health officials and outside doctors cannot intervene to stop the spread of infection[5]: "Based on the modeled initial R0 [6] of 14.8 [determined to be the rate of reinfection in the M/V DIAMOND PRINCESS], we estimated that without any interventions within the time period of 21 January to 19 February, 2920 out of the 3700 (79%) would have been infected."

The Court should consider temporarily removing as many inmates as possible from prison system, otherwise, the population of 20,000 inmates, 80% of whom will likely be infected, has the potential to take hundreds of hospital beds. Moreover, a hospitalized prisoner in detention will require law enforcement supervision, placing a otherwise unnecessary strain on police agencies .

POINT II:

---

[5] Japanese authorities had full access to the ship and brought doctors and public health officers aboard.  The authorities also removed many of the worst cases from the ship for hospitalization.
[6] In epidemiology, the basic reproduction number "R 0" of an infection can be thought of as the expected number of cases directly generated by one case in a population where all individuals are susceptible to infection.

INDIVIDUAL CHARACTERISTICS

The older one is, the more likely one will experience long-term complications or even die from corona virus.  The highest morbidity rate is for persons over 60 and Mr. Chapman is approaching this age, but the morbidity rate alone does not adequately describe the risks.   Older adults who are hospitalized for pneumonia have a significantly higher risk of new problems that affect their ability to care for themselves, and the effects are comparable to those who survive a myocardial infarction or stroke, reported researchers with the University of Michigan Health System and University of Washington School of Medicine.[7]

Mr. Chapman is hypertensive (not severely so, but hypertensive nonetheless), and patients suffering from hypertension have been shown to have a much lower survival rate and suffer more acutely.  This vulnerability involves the increased presence of angiotensin-converting enzyme in the lungs of patients suffering from both hypertension and diabetes.

Mr. Chapman does not present an unreasonable risk of flight or danger to the public under present circumstances, a calculus that makes public health its foremost consideration; the risk to society of placing previously defendant in the community is

---

[7] https://www.nurse.com/blog/2013/03/20/pneumonias-long-term-effects-comparable-to-mi/

lower and has fewer consequences than the crisis created by
turning away patients in need of hospitalization.

POINT III:

EXTRAORDINARY CIRCUMSTANCES<br>18 USC §3145(c)

Mr. Chapman has already accepted responsibility for his
criminal conduct and has been accumulating time credit toward
his sentence.  His sentencing hearing is now scheduled for July
8, 2020 when summer conditions are widely expected to reduce the
epidemic.   Mr. Chapman is motivated by concern for his health.
Otherwise, this motion has no benefit for him.  He proposes home
confinement and not what would ordinarily be considered release.
He gets no credit toward his sentence.  As a western
Massachusetts resident for 20 years with three minor children
and extended family in the area, Mr. Chapman does not present a
risk of flight.

Under the circumstances of the epidemic, there are
"exceptional reasons why such person's detention would not be
appropriate" for this post-conviction detainee.  See, 8 USC
§3145(c).   Generally, a defendant is entitled to bail post
conviction or pending appeal if he can:

> (1) establish by clear and convincing evidence that he
> is not likely to flee or pose a danger to the safety
> of any other person or the community, 18 USC §
> 3143(b)(1)(A); (2) demonstrate that the appeal raises
> a substantial question of law or fact likely to result
> in, inter alia, reversal or an order for a new trial,

8

id. § 3143 (b)(1)(B); and (3) "clearly show that there
are exceptional reasons why [his] detention would not
be appropriate," id. § 3145(c).

*United States v. Weiner*, 972 F.2d 337 (1st Cir. 1992).  Applying

this analysis to the special facts of this case, the second

consideration is not relevant.  In this District and other

districts, courts frequently release defendants for other

reasons than a pending appeal, such where a defendant's release

serves governmental and law enforcement interests.

Courts have released a defendants on grounds of illness

without particular regard to the merits of a defendant's appeal.

See, e.g., *United States v. Farlow*, 824 F. Supp. 2d 189 (D. Me.

2011) (defendant having entered a conditional guilty plea

subject to denial of a motion to suppress and released before

perfecting appeal, court finding that, while "searches of

electronically stored data is a controversial and developing

topic", defendant "simply did not present the Court with a

sufficient evidentiary record to place this constitutional

question into play").  The remedy of release prior to the

filing of an appeal is available to defendants like Mr. Chapman,

but he must show an exceptional reason.  See, also, *United

States v. Santoro*, Case No. 2:18-cr-188-DBH (D. Maine, January

24, 2019) (noting that §3145 was available to defendants but

defendant not able to offer exception reason).  The District of

Maine has concluded "that the COVID19 crisis presents an
'exceptional reason under Section 3145(c) for immediate
release." *United States v. Malcolm French, et al.,* No. 1:12-cr-
00160-JAW (D. Maine, March 31, 2020) (defendant with scarring on
lung released, First Circuit having remanded on finding
defendant's appeal presented substantial question).

CONCLUSION

This motion should be granted for the reasons set forth
above.

Dated: April 6, 2020                    Respectfully submitted,
                                        Edward Chapman, Defendant
                                        By his counsel,
                                        /s/Kevin L. Barron
                                        Kevin L. Barron, Esq.
                                        50 Congress St. - 6th Fl.
                                        Boston, MA 02109
                                        (617) 407-6837


Certificate of Service

Counsel certifies that he has caused a true copy of this
document to be served today through the CM/ECF system of this
District on the attorneys for all the parties as set forth in
the Notice of Electronic Filing and that no party requires
service by other means.

                                        /s/Kevin L. Barron