UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Cr. No. 18-10468-NMG |
| | ) | |
| 5.    CARLOS ANTUNES, | ) | |
| 11.  JOSE PEREZ-FELIZ, | ) | |
|       a/k/a "Eugenio Piedraita-Rivera," | ) | |
|       a/k/a "Roberto Patricio Ramirez," | ) | |
|       a/k/a "Grande," and | ) | |
| 13.  EDWARD CHAPMAN, | ) | |
|       Defendants | ) | |

### GOVERNMENT'S OPPOSITION TO DEFENDANTS' MOTIONS
### FOR RELEASE FROM DETENTION

CARLOS ANTUNES, EDWARD CHAPMAN, and JOSE PEREZ-FELIX, a/k/a "Eugenio Piedraita-Rivera," a/k/a "Roberto Patricio Ramirez," a/k/a "Grande," were three of seventeen individuals charged with participating in a wide-ranging fentanyl, heroin, and cocaine trafficking conspiracy. ANTUNES was a close associate of Djuna Goncalves, a violent Brockton drug trafficker. PEREZ-FELIX supplied Goncalves and ANTUNES with large quantities of fentanyl and cocaine, which they then sold to other customers. PEREZ-FELIX likewise supplied CHAPMAN (a five-time convicted drug trafficker) with large quantities of cocaine.

On November 14, 2018, ANTUNES consented to a voluntary order of detention (Docket No. 23). On June 20, 2019, PEREZ-FELIX likewise consented to detention (Docket No. 178). On several occasions, CHAPMAN moved to be released from custody, but on February 7, 2020, the Court entered an electronic order concluding, "After multiple conferences with Pretrial Services, there are no satisfactory conditions of release that can be established" (Docket No. 351). A short time later, CHAPMAN pleaded guilty to conspiracy to distribute heroin and

cocaine in quantities that will require the imposition of at least a ten-year mandatory minimum prison sentence.

All three defendants recently filed motions to re-open the question of detention based on the danger posed by the COVID-19 virus (Docket Nos. 383 & 388). ANTUNES and CHAPMAN raise largely "systemic concerns" about pre-trial incarceration posed by the virus but offer no specific information about their personal history or place of incarceration that would warrant revisiting their custodial status. Their motions should be denied.

In his motion, PEREZ-FELIX advises the Court that he suffers from diabetes, a condition that may increase his risk of contracting the virus. However, PEREZ-FELIX never mentions, even in passing, that he is illegally present in the United States; that he had previously been convicted under an alias of two drug trafficking offenses and ordered deported to the Dominican Republic; that after his deportation he returned to the United States to distribute large quantities of fentanyl and cocaine; and that a sizeable quantity of fentanyl was seized from his residence at the time he was arrested. His motion should be denied as well.

<u>Overview of the Evidence</u>. Even a cursory overview of the evidence shows that all three defendants should be detained. For years, the area around Addison Avenue is Brockton was plagued by gang-involved drug trafficking and gun violence. In the summer and fall of 2018, agents with Homeland Security Investigations (HSI) and troopers with the Massachusetts State Police (MSP) conducted an investigation into Djuna Goncalves, a violent Brockton drug trafficker, who used his home at 12 Addison Avenue as a base of operations to distribute large quantities of fentanyl, cocaine, crack cocaine, and marijuana. During the investigation, agents conducted physical surveillance, conducted surveillance using stationary pole cameras on Addison Avenue, used confidential informants to make controlled purchases of narcotics from

Djuna and others, and ultimately obtained an order authorizing the interception of wire and electronic communications from Djuna's cellular telephone. The investigation identified several violent drug traffickers who worked with Djuna to distribute fentanyl and cocaine.

On September 18, 2018, agents intercepted a series of conversations between Djuna and PEREZ-FELIX, Djuna's Boston-based drug supplier. Agents used precise location information from Djuna's cell phone to track Djuna and another co-defendant, Jermaine Gonsalves, from 12 Addison Avenue to Boston and then watched as Djuna and Gonsalves met PEREZ-FELIX on the street. After the meeting, agents observed Djuna and Gonsalves walk back to their car carrying packages covered in white plastic. Gonsalves and Djuna returned to 12 Addison Avenue, where, over the pole camera, agents observed Djuna get out of Gonsalves's rental car carrying a plastic bag and enter his home. Agents tracked and observed Djuna meet with and be re-supplied by PEREZ-FELIX on three occasions in the fall of 2018.

On October 17, 2018, agents intercepted Djuna as he took orders from two of his regular customers. One of the customers told Djuna, "I got a hundred," and when Djuna asked him what he wanted, the customer stated, "some fetty and some hard (i.e., crack cocaine)." When Djuna replied, "I don't have hard right now," the customer responded, "You have coke?" and "Powder? I take the powder." Djuna responded, "Yeah. Twenty, thirty minutes I be there." Via the pole camera, agents observed Gonsalves pull up at 12 Addison Avenue in the same rental car he and Djuna used in September to pick up fentanyl and cocaine from "Grande." Agents observed ANTUNES seated in the front passenger seat of Gonsalves's rental car. Agents saw Djuna walk out of 12 Addison Avenue toward the rental car. ANTUNES got out of the front passenger seat and sat in the back while Djuna took ANTUNES's place in the front passenger seat. Thereafter, agents followed Gonsalves, Djuna, and ANTUNES as they met one drug customer on a side

street near Addison Avenue (agents intercepted calls from Djuna to the customer arranging the precise meeting location while Djuna was in Gonsalves's rental car) and then followed the rental car to the second customer's home. As the rental car got close to the customer's address, agents intercepted a call from Djuna to the customer informing the customer he would be there in two to three minutes. Agents on surveillance watched the customer walk from the front door of his house to his driveway, where Gonsalves parked his rental car, and saw the customer walk to where Djuna was seated in the car. The rental car then proceeded back to 12 Addison Avenue.

During the investigation, agents also developed a cooperating witness (CW-1) who identified ANTUNES, Djuna, and Gonsalves as men who delivered fentanyl to him.[1] Agents seized a sizeable quantity of fentanyl from CW-1 shortly after CW-1 met with ANTUNES and CW-1 advised that it had purchased fentanyl from ANTUNES on numerous occasions over several months.

Over the late fall of 2018 and the early spring of 2019, agents received authorization to intercept three of PEREZ-FELIX's cell phones. Through these interceptions, agents identified CHAPMAN as a significant drug customer. Between October 2018 and April 2019, agents identified over a dozen trips CHAPMAN made from Pittsfield to Boston to meet with PEREZ-FELIX. While nearly all of PEREZ-FELIX's intercepted calls were in Spanish, CHAPMAN spoke only in English. CHAPMAN routinely ordered 30 to 33 grams of the "brown" from PEREZ-FELIX and usually asked PEREZ-FELIX to see if he could obtain "white" for him.

---

[1] CW-1 is charged in a federal drug trafficking case and has pleaded guilty pursuant to a plea agreement with a standard cooperation provision. CW-1 is cooperating in the hopes that its assistance will lead the government to recommend, and the Court to impose, a reduced sentence at the time of CW-1's sentencing hearing. During his testimony before a United States Grand Jury, CW-1 identified photographs of ANTUNES, Djuna, and Gonsalves and testified that the three worked to deliver fentanyl to him.

Agents watched several meetings between PEREZ-FELIX and CHAPMAN where PEREZ-FELIX met briefly with CHAPMAN at a restaurant in Dorchester after CHAPMAN ordered heroin and cocaine from him.

For instance, on March 24, 2019, agents intercepted a number of calls between PEREZ-FELIX and CHAPMAN setting up a narcotics transaction. The calls included this passage:

> PEREZ-FELIX:   How much for an ounce?
>
> CHAPMAN:   What?
>
> PEREZ-FELIX:   How much for an ounce?
>
> CHAPMAN:   Well, I'm right here on Walton street remember where we used to meet at? How about the restaurant over on eater [sic] right on the corner from you house.
>
> PEREZ-FELIX:   Huh
>
> CHAPMAN:   Hum, the thing is [U/I] I was trying to get the white, because I need the white right now, I gotta pay my guys, they works for that and still need the brown at last, but I need the white, remember that I told you the last time...
>
> PEREZ-FELIX:   Okay
>
> CHAPMAN:   But the brown...
>
> PEREZ-FELIX:   Okay
>
> CHAPMAN:   Huh
>
> PEREZ-FELIX:   Okay, see you and come by
>
> CHAPMAN:   [U/I]
>
> PEREZ-FELIX:   Let me go to somebody for the white
>
> CHAPMAN:   Alright right now the brown, I might be get some brown, but I didn't bring all the money for brown, you know . . . at least. If you want I can give 30 and I'll take on Monday from someone down there, it's up to you and definitely - definitely the white, I'll see all my workers on that . . .

5

|  |  |
|---|---|
|  | when I go home . . . Monday go to the bank, get the money and send it to you. |
| PEREZ-FELIX: | Okay. What do you need - white or brown? |
| CHAPMAN: | At least the white now, but that I said if you wanna do some brown for me and you will see the money on Tuesday I mean on Monday by Western Union, I can do that too [unintelligible] |
| PEREZ-FELIX: | No, no |
| CHAPMAN: | All right I need some white, I told you last night I need white that's why I came out there |
| PEREZ-FELIX: | Huh |
| CHAPMAN: | I need the white I – I'll pay all my guys for the white |
| PEREZ-FELIX: | Hum, let . . . let me, I got it. Okay |
| CHAPMAN: | Okay, all right, bye. |

Surveillance agents observed PEREZ-FELIX walk inside his home at 26 Walton Street in Dorchester and then drive to the area of Bowdoin Street and Norton Street. Agents observed PEREZ-FELIX go into the El Pollo restaurant, where many of their meetings took place. At that time, agents intercepted a call where PEREZ-FELIX told CHAPMAN that he was at the restaurant. Agents then saw CHAPMAN enter the restaurant with a woman identified as his girlfriend, and approximately fifteen minutes later, agents observed CHAPMAN, the woman, and PEREZ-FELIX leave the restaurant get into CHAPMAN's vehicle and drive away.

Argument. In their motions, ANTUNES and CHAPMAN present only generalized concerns about their circumstances and present no individualized facts about the status of their health that would them at particular risk. ANTUNES makes no claim whatever that he suffers from any type of pre-existing condition that places him at particular risk. CHAPMAN makes a passing reference to suffering from hypertension ("not severely so, but hypertensive

6

nonetheless") but provides no medical records or other corroborating information for the Court to review and consider. See, e.g., United States v. De La Cruz, Cr. No. 19-10447-RGS (electronic order dated March 25, 2020 denying motion to reconsider detention based on generalized COVID-19 concerns at Wyatt). Given the presumption in favor of detention in this type of drug trafficking offense, see 18 U.S.C. § 3142(e), the overwhelming strength of the evidence, the danger ANTUNES and CHAPMAN pose to the community, and the generalized nature of their claims, the government requests that their motions be denied.

PEREZ-FELIX fares no better. Instead of providing the Court with information concerning his diabetes, he cites to an affidavit – filed in countless similar motions – discussing general means of transmission of COVID-19 and concerns about treating the virus in prison settings. Even if PEREZ-FELIX proffers information about his condition before his detention hearing, his motion does not address either of the two most pressing issues surrounding his request for release. First, his motion fails to note that he distributed large quantities of fentanyl. See United States v. Baez, Cr. No. 19-40049-TSH  (electronic order dated April 10, 2020 denying similar motion for release: "Fentanyl is extremely dangerous, frequently fatal to those who take it, and in the court's view is the most harmful illegal drug that one can distribute"). Second, PEREZ-FELIX's is completely silent about the fact that he is not legally present in the U.S. Put differently, PEREZ-FELIX fails to explain how releasing him in this case so that he can instead be held in immigration custody serves any legitimate law enforcement or public health interest. See United States v. Pereira, Cr. No. 19-10446-RGS (memorandum of decision and order detaining defendant "notwithstanding [his] vulnerability" to the coronavirus due to serious medical issues because "the court finds that the dangers of his being incarcerated during the present pandemic do not outweigh his risk of flight or danger to the community").

For the foregoing reasons, these motions should be denied.

                                       Respectfully submitted,

                                       ANDREW E. LELLING
                                       United States Attorney

             By:    /s/ Christopher Pohl
                     Christopher Pohl
                     Alathea Porter
                     Assistant U.S. Attorneys

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on April 14, 2020.

                                       /s/ Christopher Pohl
                                       Christopher Pohl
                                       Assistant U.S. Attorney